UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

In re:

|  |  |
|---|---|
|  | : CHAPTER 11 |
| PETROLEUM & FRANCHISE CAPITAL, LLC and | : Case Nos. 10-51465 (AHWS) |
| PETROLEUM & FRANCHISE FUNDING, LLC | :          10-51467 (AHWS) |
|  | : |
| Debtors | : Jointly Administered |
|  | : Under Case No. 10-51465(AHWS) |

SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED
BY PETROLEUM & FRANCHISE CAPITAL, LLC AND
PETROLEUM & FRANCHISE FUNDING, LLC

James Berman, Esq.
Craig I. Lifland, Esq.
ZEISLER & ZEISLER, P.C.
558 Clinton Avenue
Bridgeport, CT  06605
Tel. 203-368-4234
Fax 203-367-9678

COUNSEL FOR PETROLEUM & FRANCHISE CAPITAL, LLC and
PETROLEUM & FRANCHISE FUNDING, LLC

Dated:  October 22, 2010

# TABLE OF CONTENTS

I. INTRODUCTION..................................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS ................................................1

III. EXPLANATION OF CHAPTER 11 .................................................................................3

    A.    OVERVIEW OF CHAPTER 11 .........................................................................................3
    B.    PLAN OF REORGANIZATION ........................................................................................4

IV. SUMMARY OF THE PLAN.............................................................................................6

    A.    GENERAL OVERVIEW .................................................................................................6
    B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................................6
    *Unclassified Claims Against the Debtors*.........................................................................7
    *Classified Claims and Interests*.....................................................................................9
        *4.    Release and Exculpation* ........................................................................15
        *5.    Injunction* ............................................................................................17
        *6.    Revocation or Withdrawal of the Plan* .....................................................17
        *7.    Modification of the Plan* ........................................................................17
    C.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................................18

V. DESCRIPTION OF THE DEBTORS.................................................................................19

    A.    OVERVIEW ..............................................................................................................19
    B.    HISTORY AND CORPORATE STRUCTURE.....................................................................20
    C.    BUSINESS AND ASSETS OF DEBTORS .........................................................................23
    D.    SECURED INDEBTEDNESS OF THE DEBTORS ...............................................................23
    E.    UNSECURED INDEBTEDNESS OF THE DEBTORS ...........................................................23

VI. THE DEBTORS' BANKRUPTCY CASES ......................................................................24

    A.    EVENTS SINCE COMMENCEMENT OF BANKRUPTCY CASE ..........................................24

VII. CONFIRMATION OF THE PLAN ................................................................................25

    A.    SOLICITATION OF VOTES; VOTING PROCEDURES .......................................................25
    *Ballots and Voting Deadline* ......................................................................................25
    *Parties in Interest Entitled to Vote*..............................................................................25
    *Definition of Impairment*............................................................................................26
    *Classes Impaired Under the Plan* ...............................................................................27
    *Vote Required For Class Acceptance*...........................................................................27
    B.    CONFIRMATION HEARING .........................................................................................27
    _____, 2010, 5:00 p.m. Eastern Time:  Deadline for parties to file and serve any objection to the Plan.
        29
    _____, 2010, 5:00 p.m. Eastern Time:  Deadline for parties entitled to vote on the Plan to have their
    *ballots received by the tabulation agent*.......................................................................29

i

_____, 2010, __:__ __.m. Eastern Time:  Commencement of the Confirmation Hearing. ....................29

C.    REQUIREMENTS FOR CONFIRMATION OF A PLAN ....................................................................29
D.    CRAMDOWN ........................................................................................................................32

**VIII. RISK FACTORS** ...............................................................................................................**34**

A.    INSUFFICIENT ACCEPTANCES .............................................................................................34
B.    CONFIRMATION RISKS ........................................................................................................35
C.    CONDITIONS PRECEDENT .....................................................................................................35

**IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...........................**35**

**X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ........................................**36**

A.    TAX CONSEQUENCES TO THE DEBTORS ...............................................................................37
B.    TAX CONSEQUENCES TO CREDITORS OR INVESTORS ...........................................................37
C.    INFORMATION REPORTING AND WITHHOLDING ...................................................................38

**XI. CONCLUSION** .....................................................................................................................**39**

G:\JB\P\Petroleum & Franchise\Pleadings\Plan and Disclosure Statement\Second Amended Plan and D-S\SECOND AMENDED Disclosure Statement-Blacklined.docx

# I.  INTRODUCTION

Petroleum & Franchise Capital, LLC and Petroleum & Franchise Finance, LLC (collectively, the "Debtors") submit this Disclosure Statement with respect to the Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by Petroleum & Franchise Capital, LLC and Petroleum & Franchise Finance, LLC (the "Plan").  This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan.  A copy of the Plan is attached hereto as Exhibit A.  Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions, Construction, and Interpretation").

For a summary of the proposed treatment of your Claim or Interest under the Plan, please see the charts on the pages below.

# II.  NOTICE TO HOLDERS OF CLAIMS AND INTERESTS

The purpose of this Disclosure Statement is to enable Holders of Claims against and Interests in the Debtors whose Claims and Interests are impaired under the Plan and are entitled to vote on the Plan to make an informed decision in exercising their right to vote to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT CAREFULLY.**

On _____, 2010, the Bankruptcy Court conducted a hearing on the adequacy of the Disclosure Statement and subsequently entered an order pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against and Interests in the Debtors, to make an informed judgment with respect to the acceptance or rejection of the Plan.  A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement.    APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

1

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and their professionals, no person has been authorized to use or promulgate any information concerning the Debtors, their business, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plan. No Holder of a Claim or Interest entitled to vote on the Plan should rely upon any information relating to the Debtors, their business, or the Plan other than that contained in the Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the sources of all information set forth herein are the Debtors and their professionals.

**After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and returning the same, to the address set forth on the ballot, in the enclosed return envelope so that it will be received by the Zeisler & Zeisler, P.C., 558 Clinton Avenue, P.O. Box 3186, Bridgeport, CT 06605, Attention: James Berman, Esq. or Craig I. Lifland, Esq., no later than 5:00 p.m. Eastern Time on _____, 2010.**

If you do not vote to accept the Plan, or if you are not entitled to vote on the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims or Interests. See "Solicitation of Votes; Voting Procedures," "Vote Required for Class Acceptance," and "Cramdown" in Article VIII ("Confirmation of the Plan") below.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M. EASTERN TIME ON _____, 2010.** For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, see "Ballots and Voting Deadline" in Section VIII.A.1 below.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on _____, 2010,

2

**at _____ __.m. Eastern Time**, in the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division.  **The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____, 2010**, in the manner described in Section VIII.B below under the caption, "Confirmation Hearing."

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO ACCEPT THE PLAN**.

## III. <u>EXPLANATION OF CHAPTER 11</u>

**A.     Overview of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Pursuant to chapter 11, the debtor in possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the bankruptcy petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.  In the present chapter 11 cases, the Debtors have remained in possession of their property and continued to operate their businesses as debtors in possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, *inter alia*, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in a debtor. Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Exclusive Period").  However, section 1121(d) of the Bankruptcy Code permits the court to extend or reduce the Exclusive Period upon a showing of "cause." After the Exclusive Period has expired, a creditor or any other party in interest may file a plan,

3

unless the debtor has filed a plan within the Exclusive Period, in which case, the debtor is generally given 60 additional days (the "Solicitation Period") during which it may solicit acceptances of its plan. The Solicitation Period may also be extended or reduced by the court upon a showing of "cause."

## B.   Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's estates. After a plan of reorganization has been filed, certain holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to Holders of Claims against and Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless deny confirmation of the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests" test and be "feasible." The "best interests" test requires that the value of the consideration to be distributed to the holders of claims and interests under a plan may not be less than those parties would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

The Debtors believe that the Plan satisfies all applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement. The Debtors support confirmation of the Plan and urge all holders of impaired Claims and Interests to vote to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount

4

of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the present case, only the holders of impaired Claims or Interests who actually vote will be counted as either accepting or rejecting the Plan.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in cash. Claims against the Debtors in Class 3 are impaired under the Plan and the Holders of those Claims are thus entitled to vote on the Plan. Claims against the Debtors in Class 4 are not impaired under the Plan, and the Holders of those Claims and Interests are thus not entitled to vote on the Plan. Administrative Expense Claims and Priority Tax Claims are unclassified; their treatment is prescribed by the Bankruptcy Code. The Holders of such Claims are not entitled to vote on the Plan.

The bankruptcy court may also confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will, *inter alia*, receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or realize the indubitable equivalent of its secured claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless all senior classes are paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if: (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of all allowed claims in such class.

The Debtors believe that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims or Interests, and can therefore be confirmed, if necessary, even if not accepted by all voting Classes of Claims or Interests. The Debtors reserve the right to request confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

## IV. SUMMARY OF THE PLAN

### A. General Overview

The Debtors believe, and will demonstrate at the Confirmation Hearing, that confirmation and consummation of the Plan are in the best interests of Holders of Claims against and Interests in the Debtors. Generally, the Plan provides that Holders of Allowed Claims shall be paid in full with interest and Holders of Interest shall retain their Interest.

### B. Classification and Treatment of Claims and Interests

The following is a summary of the classification and treatment of Claims and Interests under the Plan. Such classification is without prejudice to a party in interest asserting that it is entitled to a different classification or treatment under the Plan or applicable law. The amounts of Administrative Expense Claims and Priority Tax Claims shown below constitute the Debtors' estimates of the aggregate amounts of such Claims, taking into account amounts, if any, paid or projected to be paid before the Effective Date. The amounts of Claims and Interests shown below reflect the Debtors current estimates of the likely amounts of such Claims and Interests, subject to the resolution of Claims and/or Interests that the Debtors believe are subject to disallowance or reduction. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.

**THIS IS ONLY A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. THE PLAN INCLUDES OTHER PROVISIONS THAT MAY AFFECT YOUR RIGHTS. YOU ARE URGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE**

**PLAN.**

Unclassified Claims Against the Debtors

In accordance with section 1123(a)(1) of the Bankruptcy Code, unclassified Claims against the Debtors consist of Administrative Claims and Priority Tax Claims. Based on their books and records and their projections for future expenses, the Debtors presently estimate the amounts of such Claims as follows:

a.    <u>Allowance and Payment of Administrative Claims</u>

The Holder of any Administrative Claim that is incurred, accrued or in existence prior to the Effective Date, other than (a) a Fee Claim, (b) an Allowed Administrative Claim, or (c) a liability in the Ordinary Course of Business must file with the Bankruptcy Court and serve on all parties required to receive such notice a request for the allowance of such Administrative Claim on or before thirty (30) days after the Effective Date. Such request must include at a minimum (a) the name of the Holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim. Failure to timely and properly file and serve the request required under Section 2.01(a) of the Plan may result in the Administrative Claim being forever barred and discharged. Objections to such requests must be filed and served pursuant to the Bankruptcy Rules on the requesting party and the Reorganized Debtors within thirty (30) days after the filing of the applicable request for payment of an Administrative Claim.

Any Person who holds or asserts an Administrative Claim that is a Fee Claim shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice a Fee Application within thirty (30) days after the Effective Date. Failure to timely and properly file and serve a Fee Application as required under Section 2.01(b) of the Plan may result in the Fee Claim being forever barred and discharged. No Fee Claim will be deemed Allowed until an order allowing the Fee Claim becomes a Final Order. Objections to Fee Applications must be filed and served pursuant to the Bankruptcy Rules on the Reorganized Debtors and the Person to whose application the objections are filed within thirty (30) days after the filing of the Fee Application subject to objection. No hearing may be held on a Fee Application until its objection period has expired.

An Administrative Claim with respect to which a request for payment is required and has been properly filed pursuant to Section 2.01(a) of the Plan shall become an Allowed

Administrative Claim if no timely objection is filed.  If a timely objection is filed, the Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order.  An Administrative Claim that is a Fee Claim, and with respect to which a Fee Application has been properly filed and served pursuant to Section 2.01(b) of the Plan, shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order.

Except to the extent that a Holder of an Allowed Administrative Claim has been paid prior to the Effective Date, or agrees to a different treatment, each Holder of an Allowed Administrative Claim (other than Allowed Administrative Claims incurred in the Ordinary Course of Business, which are paid pursuant to Section 2.01(e) of the Plan) shall receive, in full satisfaction, release and discharge of and exchange for such Administrative Claim, and after the application of any retainer or deposit held by such Holder, Cash equal to the Allowed amount of such Administrative Claim within ten (10) Business Days after the Allowance Date with respect to such Allowed Administrative Claim, provided, however, that in the event the Reorganized Debtor has insufficient Cash to pay all Allowed Fee Claims in full as set forth above, then the Reorganized Debtor and all Holders of Allowed Fee Claims may agree to alternative treatment for the payment of all Allowed Fee Claims.

Holders of Administrative Claims based on liabilities incurred in the Ordinary Course of Business of the Debtors during the Bankruptcy Cases (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes, or alleged Administrative Claims arising in tort) shall not be required to file any request for payment of such Claims. Administrative Claims incurred in the Ordinary Course of Business of the Debtors will be paid by the Debtors and the Reorganized Debtor pursuant to the terms and conditions of the transaction giving rise to such Administrative Claim, without any further action by the Holders of such Administrative Claim.  The Debtors and the Reorganized Debtor reserve and the Reorganized Debtor shall have the right to object before the Objection Deadline to any Administrative Claim arising, or asserted as arising, in the Ordinary Course of Business, and shall withhold payment of such claim until such time as any objection is resolved pursuant to a settlement or a Final Order.

b.      Allowance and Payment of Priority Tax Claims

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Initial Distribution Date, each Holder of an Allowed Priority Tax Claim, in full satisfaction, release, settlement, and discharge of and exchange for such Claim, shall receive from the Reorganized

8

Debtor, (a) deferred Cash payments over a period not exceeding five (5) years after the Petition Date in an aggregate principal amount equal to the Allowed amount of such Priority Tax Claim, plus interest, from the Petition Date through the date such Claim is paid in full, on the unpaid portion thereof at the rate of interest determined under applicable nonbankruptcy law as of the calendar month in which the Confirmation Date occurs, in equal annual installments with the first payment to be due on the later of (i) the Initial Distribution Date or (ii) five (5) Business Days after the date when a Priority Tax Claim becomes an Allowed Priority Tax Claim, and subsequent payments to be due on each anniversary of the Initial Distribution Date, or (b) such other less favorable treatment to which such Holder and the relevant Reorganized Debtor agree in writing.  Notwithstanding the foregoing, (a) any Claim or demand for payment of a penalty (other than a penalty of the type specified in Bankruptcy Code section 507(a)(8)(G)) shall be Disallowed pursuant to the Plan and the Holder thereof shall not assess or attempt to collect such penalty from any Debtor, the Reorganized Debtor or from any of their Assets, and (b) the Reorganized Debtor shall have the right to pay any Allowed Priority Tax Claim, or any unpaid balance of such Claim, in full, at any time after the Effective Date, without premium or penalty.

c.    U.S Trustee Fees

The Reorganized Debtor shall timely pay to the United States Trustee on behalf of the Reorganized Debtor all quarterly fees incurred by such Debtor pursuant to 28 U.S.C. § 1930(a)(6) until the Bankruptcy Case of such Debtor is closed.  The Reorganized Debtor or each Reorganized Debtor shall serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) after the Effective Date that such Reorganized Debtor's Bankruptcy Case remains open.

Classified Claims and Interests

The following is an estimate of the numbers and amounts of classified Claims and Interests as set forth in the Plan:

**Nothing herein shall be dispositive of the allowance of any Claims or Interests or constitute a waiver by the Debtors or any other party of the right to object to such Claims or Interests.  The Debtors are not stipulating to the validity or amount of any of the Claims or Interests for which estimations are provided herein.  The amounts set forth herein are estimates based upon the Schedules and proofs of Claim and Interests filed as of the Date**

9

**the Plan is filed.[1]**

## Class 1 - Non-Tax Priority Claims - Unimpaired

Estimated Amount: $_-0-__

Treatment:  On or as soon as practicable after the later of (a) the Initial Distribution Date or (b) the Allowance Date with respect to an Non-Tax Priority Claim, the Holder of such Allowed Non-Tax Priority Claim shall receive from the Debtors in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Non-Tax Priority Claim, (y) Cash in an amount equal to the Allowed amount of its Non-Tax Priority Claim, or (z) such other, less favorable treatment to which such Holder and the Debtors or the relevant Reorganized Debtor agree in writing.  To the extent an Allowed Non-Tax Priority Claim entitled to priority treatment under 11 U.S.C. §§ 507(a)(4) or (5) exceeds the statutory cap applicable to such Claim, such excess shall be treated as a Class 5 General Unsecured Claim against the relevant Debtor.

## Class 2 - DZ Bank Secured Claim - Impaired

Allowance of DZ Secured Claims.  The DZ Secured Claims shall be Allowed in an amount to be determined by the Bankruptcy Court.

Treatment.  In full satisfaction, settlement, release and discharge of and in exchange for the Allowed DZ Secured Claims and all Liens securing such Claims, DZ Bank shall receive, on or as soon as practicable after the later of the Effective Date or the Allowance Date with respect to the DZ Secured Claims: (i) the DZ Promissory Note, which shall be issued by the Reorganized Debtor in the principal amount of the Allowed DZ Secured Claims plus any interest or other fees, subject to Bankruptcy Court approval, accrued thereon during the chapter 11 case.  The Plan Supplement shall identify the principal amount of the DZ Promissory Note, and the Plan Supplement shall include the form of the DZ Promissory Note.  To the extent there is any

---

[1] In some instances, creditors have filed duplicative proofs of claim against both Debtors.  For purposes of estimating the amount and number of claims herein, and to avoid the overestimation of Claims, the Debtors have treated such duplicative claims as one claim and have attempted, where reasonably possible, to allocate any duplicative proofs of claim among the appropriate Debtor(s).  Further, the estimated amounts herein do not include any amounts related to proofs of claim for which the claimant did not assert a specific amount or stated that its claim amount was "unknown."

inconsistency or conflict between the DZ Promissory Note and the Plan, the provisions of the Plan shall control.  The DZ Promissory Note shall include the following terms:

Obligor.  The Reorganized Debtor shall be liable for all obligations arising under the DZ Promissory Note.

Collateral.  The DZ Collateral shall consist of all Collateral that secures the Allowed DZ Secured Claims as of the Effective Date, plus all assets acquired by the Reorganized Debtor after the Effective Date.  DZ Bank shall retain its Liens on the DZ Collateral and the proceeds of the DZ Collateral, if any, until:  (A) the DZ Promissory Note has been satisfied by its terms, (B) the DZ Collateral has been transferred or abandoned to, or foreclosed upon by, DZ Bank, or (C) the obligor under the DZ Promissory Note and DZ Bank have agreed in writing upon such other treatment of the DZ Collateral.

Interest.  Interest on the DZ Promissory Note shall accrue at a rate per annum (computed on a 360-day basis for the actual number of days elapsed) equal to two and three quarter percent (2.75%) or such rate determined by the Bankruptcy Court under applicable law and shall be paid in Cash monthly in arrears on the fifteenth (15th) Business Day of each calendar month after the Effective Date.

Payment of Principal.   On or before the fifteenth (15th) Business Day of each month, commencing the first (1st) month following the Effective Date, the Reorganized Debtor shall make principal payments on the DZ Promissory Note in the amounts as scheduled in Exhibit A[2] to the Plan, plus eighty-five percent (85%) of such additional principal payments as are collected from loan portfolio obligors and received by Reorganized Debtor after the Effective Date.

Additional Payments of Interest and Principal.   On the later of Allowance Date or the Initial Distribution Date, the Reorganized Debtor shall also make any unpaid principal and interest payments as scheduled in Exhibit A to the Plan, which accrued between the Petition Date and the Initial Distribution Date.

Prepayment.  The Reorganized Debtor may pay or prepay the principal amount due under the DZ Promissory Note at any time prior to its maturity date without penalty or premium.

---

[2] As such payment schedule shall be amended to reflect early payments of principal and interest received from loan portfolio obligors and paid to DZ Bank.

11

Maturity Date.  The DZ Promissory Note shall mature on December 31, 2017.

Payment Default.  The sole event of default under the DZ Promissory Note shall be a Payment Default.

Reserve Account.  On the Effective Date, the Reorganized Debtor shall establish and maintain, for the term of the DZ Promissory Note, a segregated account in the amount of one million two hundred thousand dollars ($1,200,000) to be used as a reserve for required payments due under the DZ Note.

Remedies Upon Payment Default; Opportunity to Cure.  Upon the occurrence of a Payment Default, DZ Bank may deliver a notice of Payment Default to the obligor under the DZ Promissory Note.  The obligor under the DZ Promissory Note shall have a period of thirty (30) days after receipt of a notice of Payment Default to cure such default.  If such Payment Default has not been cured within such 30-day period, then DZ Bank may pursue the rights and remedies available to it with respect to the DZ Promissory Note and the DZ Collateral.

Reporting.  No more than thirty (30) days after the end of each calendar year after the Effective Date, the Reorganized Debtor shall deliver to DZ Bank a remittance report for the preceding calendar year and a receivable schedule as of December 31 of the preceding calendar year of the DZ Collateral.

Collateral Trust Agreement.  On the Effective Date a new Collateral Trustee Agreement with U.S.  Bank National Association as custodian shall be executed by the Reorganized Debtor, which shall be set forth in the Plan Supplement.  The Reorganized Debtor shall execute such documents deemed necessary to grant to DZ Bank a first priority perfected security interest in the DZ Collateral.

No Force to Pre-Petition Loan Documents.  On the Effective Date, all Pre-Petition date loan documents, including but not limited to those documents evidencing the relationship between the Debtors and DZ Bank, the Collateral Trustee and backup servicer, Lyon Financial Services, Inc. executed by the Debtors and DZ Bank, and such other third parties and shall be null and void and have no operative effect.

Releases.  If DZ Bank accepts and supports the Plan, the Debtors shall release DZ Bank from any and all claims known, and unknown, as of the Effective Date

G:\JB\P\Petroleum & Franchise\Pleadings\Plan and Disclosure Statement\Second Amended Plan and D-S\SECOND AMENDED Disclosure Statement-Blacklined.docx

**Class 3 - General Unsecured Claims - Impaired**

Estimated Amount: $605,000

Treatment:  Each Allowed General Unsecured Claim in Class 3 shall include interest thereon, at the Case Interest Rate, from the Petition Date through the date such Allowed General Unsecured Claim is paid in full.  Each Holder of an Allowed General Unsecured Claim in Class 3 shall receive from the Debtors quarterly Cash payments of twelve and one half percent (12.5%) of its Allowed Claim, commencing with the first full calendar quarter after the Effective Date and continuing until all Allowed General Unsecured Claim in Class 3 are paid in full, totaling the Allowed amount of such Claim in full satisfaction, settlement, release and discharge of and in exchange for such Claim.  Each quarterly Cash payment shall be made no later than ten (10) Business Days after the end of each calendar quarter.

**Class 4 - Interests in the Debtors - Unimpaired**

Treatment:  The Holders of all Allowed Interests in the Debtors, shall retain their Interests in the Reorganized Debtor.

**C.**    **Means of Implementation of the Plan**

1.    Sources of Cash for Plan Distributions

The sources of Cash necessary for the Reorganized Debtor to pay Allowed Claims that are to be paid in Cash by the Reorganized Debtor under the Plan will be:  (a) the Cash of the Reorganized Debtor on hand as of the Effective Date; (b) Cash arising from the operation, ownership, maintenance, and/or sale of the Assets owned, managed, and/or serviced by or at the direction of the Debtors, including, without limitation, the DZ Collateral; (c) any Cash generated or received by the Reorganized Debtor after the Effective Date from any other source, including, without limitation, any recoveries from the prosecution of all Causes of Action and revenues from new loans generated by the Reorganized Debtor as of the Effective Date.

2.    Merger

On the Effective Date, PFC will merge into PFF.  The effect of the merger will include a substantive consolidation of the PFC and PFF estates.

3.      Management After the Effective Date

From and after the Effective Date the Reorganized Debtor shall continue to perform the
management responsibilities of the Debtors pursuant to the Operating Agreement.  The officers
of the Reorganized Debtor shall be (i) Stanley A. Moskowitz, President and CEO, (ii) Kenneth
Siranko, Executive Vice President and Chief Operating Officer, and (iii) Sean Dunn, Sr. Vice
President.  Compensation shall be the same as existed prior to the Petition Date.  The Directors
of the Reorganized Debtor shall be Stanley Moskowitz and Kenneth Siranko.  Below is a brief
biographical description of the officers of the Reorganized Debtor

i.      **Stanley A. Moskowitz, President and CEO**
        Stanley commenced his career in banking and finance at European American
        Bank in 1979. Shortly thereafter, he joined Manufacturers Hanover Leasing
        Corporation until he founded Execulease Corporation, a healthcare, commercial
        and industrial equipment lender in 1983. In 1994, Execulease was acquired by
        Anthem Financial, Inc., a wholly-owned subsidiary of The Associated Insurance
        Companies, Inc. where Stanley remained until Anthem was acquired by Newcourt
        Credit Group. Since then, he was President & CEO of QuesTech Financial LLC, a
        specialty commercial finance lender in a strategic alliance with Prudential
        Financial. Mr. Moskowitz received his MBA in Corporate Finance in 1980.

ii.     **Kenneth J. Siranko, Executive Vice President/COO**
        Ken, a Vietnam Navy veteran, spent over twenty years with GE Capital in various
        credit and operations management capacities, including Operations Manager for
        Vendor Financial Services' Diversified Industries Group, and Operations
        Manager for New Business Development. He also served as the Chief Credit
        Officer of the Commercial Equipment Finance Division of GECC, where his
        responsibilities extended to a wide array of collateral types, including those
        underwritten by QuesTech Financial. Ken received GECC's highest award, The
        Pinnacle Club, for three years in recognition of his individual performance. From
        1994 to 1997, Mr. Siranko served as Senior Vice President and Chief Operations
        Officer of Execulease Corporation and Executive Vice President & COO of
        QuesTech Financial.

iii.    **Sean  P.  Dunn,  Senior  Vice  President-Credit  and  Operations**
        Sean commenced his career with GE Capital in 1986, holding various positions of
        increasing  responsibility  including  Portfolio  Account  Manager,  Senior  Credit

14

Analyst, Assistant Vice President-Underwriting and Risk Manager-Global Acquisitions. During his tenure there, he successfully completed eleven international acquisitions totaling $12 Billion in countries such as China, France, Germany, India, Indonesia, Mexico and Thailand. In addition, Sean has extensive GE Capital training in Quality (Six Sigma), Work-out and Integration Management. From 2000-2007 Mr. Dunn served as Vice President -Credit and Operations of QuesTech Financial. He received his BS in Finance from Quinnipiac College in 1986.

4.    **Post Effective Date Operations**

The Reorganized Debtor shall manage and service the loan portfolio.  Attached hereto as Exhibit "B" is a projected cash flow reflecting income and disbursements required for operations and payments to creditors in accordance with the terms and provisions of the Plan.

The Debtors' income is primarily based upon the fixed schedule of payments of the obligors in the loan portfolio for which over 77% represent matured loans meaning they have been in existence for over ten years and collectability is extremely high.  In addition, the Debtors' Loans are secured by assets and guarantees such that their credit worthiness is excellent.  Over the Debtors' 12 year history, the Debtors retail Petro and Dunkin Donuts loan portfolio have experienced zero net losses, thus the reliability of the income set forth in the attached cash flow is high.

The Debtors anticipate making future loans from available cash after payment of Plan obligations and collection of pre-payment premiums from loans which are paid early.  Thus the Debtors anticipate building cash reserves in order to fund operations in the absence of any additional advances from DZ Bank.

4.    Release and Exculpation

(a)    Release by Debtors.  Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, the Debtors and the Reorganized Debtor, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered or executed thereunder), whether for

15

tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtor, the Bankruptcy Cases, or the Plan; provided, however, that no Releasee shall be released or discharged from any of the Debtors or from any Claim or Cause of Action specifically preserved or transferred under the Plan.

(b)  <u>Exculpation.</u>  Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, the Debtors and all other Persons, along with their respective present or former employees, agents, officers, directors and principals, shall be deemed to have released the Releasees from, and none of the Releasees shall have or incur any liability or obligation for, any Claim, cause of action or other assertion of liability, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise, to any Holder of a Claim or Interest or any other Person for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of the Bankruptcy Cases, the operation of the Debtors' business during the Bankruptcy Cases, the formulation, negotiation, preparation, filing, dissemination, approval, or confirmation of the Plan, the Disclosure Statement, the solicitation of votes for or confirmation of the Plan, the consummation or administration of the Plan, or the property to be liquidated and or distributed under the Plan, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction.  The foregoing parties will be entitled to rely reasonably upon the advice of counsel in all respects regarding their duties and responsibilities under the Plan.

Each Person to which Section 9.05 of the Plan (Release and Exculpation) applies shall be deemed to have granted the releases set forth in such Section notwithstanding that it may hereafter discover facts in addition to, or different from, those that it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Persons expressly waive any and all rights that they may have at common law or under any statute or other applicable law that would limit the effect of such releases to those claims or causes of action actually known or suspected to exist as of the Effective Date.

16

5.      Injunction

Except as otherwise provided in the Plan, the Confirmation Order shall provide that from and after the Effective Date, all Holders of Claims against and Interests in the Debtors are permanently enjoined from taking any of the following actions against the Debtors or the Reorganized Debtor or any of their properties on account of any such Claim or Interest:  (a) commencing or continuing in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance or Lien; (d) asserting a setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors; and (e) commencing or continuing, in any manner or in any place, any action that does not conform to or comply with, or is inconsistent with, the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order.  If allowed by the Bankruptcy Court, any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

6.      Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke and/or withdraw the Plan at any time before the Confirmation Date.  If the Debtors revoke or withdraw this Plan, or if confirmation or the Effective Date of the Plan does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors or any other Person.

7.      Modification of the Plan

The Debtors reserve the right to modify the Plan in writing at any time before the Confirmation Date, provided that (a) the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and (b) the Debtors shall have complied with Bankruptcy Code section 1125.  The Debtors further reserve the right to modify the Plan in writing at any time after the Confirmation Date and before substantial consummation of the Plan, provided that (a) the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123, (b) the Debtors shall have complied with Bankruptcy Code section 1125, and (c)

17

the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under Bankruptcy Code section 1129.  A Holder of a Claim or Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

## C.    Executory Contracts and Unexpired Leases

The Plan constitutes and incorporates a motion by the Debtors under Bankruptcy Code sections 365 and 1123(b)(2) to (a) reject, as of the Effective Date, all Executory Contracts to which a Debtor is a party, except for any Executory Contract that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date, and (b) assume all Executory Contracts identified in the Schedule of Assumed Contracts that will be included in the Plan Supplement.

The Confirmation Order shall constitute an order of the Bankruptcy Court under Bankruptcy Code sections 365 and 1123(b)(2) approving the rejection or assumption, as applicable, of Executory Contracts pursuant to the Plan as of the Effective Date.  Notice of the Confirmation Hearing shall constitute notice to any non-debtor party to an Executory Contract that is to be assumed or rejected under the Plan of the Debtors' intent to assume or reject such Executory Contract and any related Cure Amount proposed by the Debtors.

If the rejection of an Executory Contract pursuant to Section 7.01 of the Plan gives rise to a Claim by any non-Debtor party or parties to such Executory Contract, such Claim shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtor or the Estates, or the agents, successors, or assigns of the foregoing, unless a proof of such Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtors on or before the Rejection Bar Date.  Any Holder of a Claim arising out of the rejection of an Executory Contract that fails to file a proof of such Claim on or before the Rejection Bar Date shall be forever barred, estopped, and enjoined from asserting such Claim against the Debtors, Reorganized Debtors, The Reorganized Debtor, the Estates or any of their Assets and properties.  Nothing contained herein shall extend the time for filing a proof of Claim arising from or related to rejection of any Executory Contract rejected before the Confirmation Date.

Any Rejection Claim arising from the rejection of an Executory Contract shall be treated as a General Unsecured Claim pursuant to the Plan, except as limited by the provisions of

18

Bankruptcy Code sections 502(b)(6) and 502(b)(7) and other applicable law.  Nothing contained herein shall be deemed an admission by the Debtors that such rejection gives rise to or results in a Rejection Claim or shall be deemed a waiver by the Debtors or any other party in interest of any objections to such Rejection Claim if asserted.

Except as otherwise provided in a Final Order, pursuant to Bankruptcy Code sections 365(a), (b), (c) and (f), all Cure Amounts that may require payment under Bankruptcy Code section 365(b)(1) under any Executory Contract that is assumed pursuant to a Final Order shall be paid by The Reorganized Debtor within fifteen (15) Business Days after such order becomes a Final Order with respect to undisputed Cure Amounts or within fifteen (15) Business Days after a Disputed Cure Amount is Allowed by agreement of the parties or a Final Order.  If a party to an assumed Executory Contract has not filed an appropriate pleading on or before the date of the Confirmation Hearing disputing the amount of any Cure Amount proposed by the Debtor, the cure of any other defaults, the promptness of the Cure Amount payments, or the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters.  Any party to an assumed Executory Contract that receives full payment of a Cure Amount shall waive the right to receive any payment on a Class 3 General Unsecured Claim that relates to or arises out of such assumed Executory Contract.

## V. <u>DESCRIPTION OF THE DEBTORS</u>

### A.    Overview

The Debtors, specialty commercial finance lenders, provide experienced national and regional multi-site quick service restaurant franchisees and real estate-based retail petroleum/convenience store operators with project and term financing for real estate and business acquisitions. Their clients require capital for a variety of purposes, including, but not limited to, new site development and construction, site acquisitions and refinancing, remodeling and leasehold improvements as part of our borrowers' growth.

The members of the Debtors' executive management team are the shareholders of and have operated the Debtors and their predecessor company, QuesTech Financial LLC ("QuesTech"), since its inception in 1998.  Since inception, the Debtors have originated, processed, documented and funded approximately 550 loans with an aggregate initial principal amount totaling approximately $250 million and continues to service 87 loans to quick service restaurant and

retail petroleum/convenience store operators with an aggregate initial principal amount of approximately $63,033,126 million as of August 2010.

Originations are consistent with the underwriting criteria outlined in the Debtors' *Credit Policies and Procedures Manual*. Loans consist primarily of 10-year commercial loans for leaseholds made to experienced operators of quick service restaurants, most notably Dunkin' Donuts and 20-year commercial mortgage loans for experienced retail petroleum/convenience store operators and Dunkin' Donuts franchisees. The Debtors focus their marketing stratagem on experienced operators with 3 to 7 locations and in business approximately 5 years.

The Debtors will continue to focus on providing financing to retail petroleum providers that have multiple sources of revenues, most notably convenience stores, which supplement gasoline profits with core convenience store items such as cigarettes, beer and soda. Other attractive borrower attributes include: (i) operators that receive zero-interest rate loans from oil companies for equipment or remodeling, which demonstrates the oil company's confidence in the operator and viability of the site to generate a projected minimum gas volume; and (ii) stations that have granted oil companies the right-of-first-refusal to take-out the Debtors' loan in the event of a default by the owner/operator, thereby reducing the Debtors' foreclosure risk. The Debtors do not finance petroleum sites operated by absentee ownership/management as historical experience demonstrates that failure of a majority of retail petroleum sites is attributed to mismanagement rather than insufficient sales. Recent consolidation in the oil industry has forced national oil companies to sell corporate owned locations, creating opportunities for operators and managers to become owners of the stores they have managed for several years. The Debtors believe this sector's size, profitability and growth potential provides an attractive borrower base for the Debtors.

**B.      History and Corporate Structure**

The Debtors are Delaware limited liability companies that were formed in 2007 and acquire the loan portfolio of Questech Financial, LLC, incorporated in 1998 and owned by the Debtors principals.

**C.      <u>Events Leading to the Filing (Relationship with DZ Bank)</u>**

In the autumn of 2008, the Debtors notified DZ Bank that it was the intention of Babcock & Brown (the Debtors' subordinate secured lender) not to honor their $40MM subordinated debt facility commitment to the Debtors. Under the terms of the existing agreement, PFF received a

20

senior advance rate of 85% with the remaining 15% provided by Babcock.   Initially, DZ Bank expressed its interest in working with the Debtors and continued to allow the excess waterfall from obligor payments to be retained by the Debtors (approx. $400M-500M per month) through December 2008.  Shortly thereafter, DZ Bank unilaterally withheld waterfall proceeds to the Debtors in Jan 2009 and until July 2009. This action denied the Debtors the necessary funds to service their loan portfolio and the Debtors were compelled to draw upon cash resources.  DZ Bank expressed concern that it wanted the advance rate to drop to 80%. The Debtors agreed but this could not be accomplished instantaneously,

PFC/PFF had to charge off an established account in March 20 which raised the advance rate to approximately 89%.  Part of the Debtors' negotiated facility with Babcock included a $5.0MM line to be used exclusively for defaulted contracts that were delinquent for over 120 days.  This facility vanished when Babcock reneged on its strategic alliance with the Debtors. The Debtors then agreed to repay DZ Bank monthly with the excess waterfall above the $226M per month needed to operate its business. In other words, the Debtors agreed to accelerated principal payments to DZ Bank.  This appeared acceptable to DZ in February of 2009, and the Debtors believed it would take approximately one year to repay DZ Bank the amount due on the defaulted contract.

During the summer of 2009, DZ Bank commenced aggressive negotiations with the Debtors to reduce their facility commitment from $175MM to $75MM. In good faith the Debtors agreed, as DZ Bank expressed its desire to continue the relationship and corroborated its intention by remitting waterfall distributions to the Debtors from July to September 2009 in the amount of $200M per month. That fall, DZ Bank insisted the Debtors execute a modification to the existing loan documentation which was onerous, and with the goal to bring the advance rate down to 80% by June 2010. Again in good faith, the Debtors offered DZ Bank an additional 50 basis points spread to their lender margin to increase the profitability for DZ Bank as the Debtors were confident in their ability to work out the defaulted account. The Debtors executed that modification in January 2010, and DZ Bank paid the Debtors for December 2009 and January 2010.

Sometime in February 2010, the Debtors experienced a default in their portfolio for approximately $2.9 million of which DZ Bank, as the Debtors' senior lender, had advanced approximately $2.3 million. The Debtors offered to pay DZ Bank $500,000 over a ten week period to allow the Debtors time to restructure the transaction with the obligor and return the loan to their portfolio as a "Rehabilitated Receivable"  as defined under the applicable loan

documentation.  Each month, in addition to DZ Bank sweeping the excess waterfall from the monthly payments, it took an additional $200,000 per month. The third month the Debtors expected to receive $100,000 of the waterfall but it was withheld by DZ Bank.

In 2009, DZ Bank withheld a total of $1.4 million from the waterfall which was above the amount the Debtors were paying back on the defaulted account and through June 2010 withheld another $800,000. With the second defaulted account, then a Rehabilitated Receivable, the Debtors advance rate was down to 83%.

    In summary, the Debtors have never missed a scheduled payment to DZ Bank.  The breach by Babcock and Brown[3] of its funding requirements precipitated action by DZ Bank to reduce the advance rate, which the Debtors agreed to do, but could not do instantaneously as required by DZ Bank.  Thus, the Debtors were in covenant default under the pre-petition loan documentation.  When it became clear that DZ Bank intended to take steps to put the Debtors out of business, notwithstanding that they never failed to make a scheduled payment to DZ Bank, and there was significant equity above DZ Bank's claim, and the covenant default would have been cured within a reasonable time, the Debtors sought protection under Chapter 11 in order to avoid the destruction of value and maximize return to all parties in interest.

---

[3] The Debtors sued Babcock and Brown alleging such a breach.  The result was a settlement which, inter alia, relieved the Debtors of approximately 11 million dollars of subordinated secured debt.

## C.      Business and Assets of Debtors

Prior to the Petition, PFC operated as a loan originator and servicer and drafted transaction documentation for the loans which are then assigned to PFF.  PFC would receive a servicing fee from loan proceeds in accordance with the pre-petition loan documents with DZ Bank and all of the loan proceeds in DZ collateral are owned by PFF.  However, for all intent and purposes the Debtors operated as if they were a single entity and there was no distinction made between PFF and PFC when providing services and operating the companies.

As set forth in the Debtors' Schedules of Assets and Liabilities and the Statement of Financial Affairs, as amended, and filed with the Clerk of the United States Bankruptcy Court, the Debtors' primary asset consists of its loan portfolio.  The notes under the loan portfolio are owned by PFF and the present value of these loan portfolio is $63,969,353.14, as of the Petition Date.  The loan portfolio includes approximately 110 accounts and approximately 88 obligors.  As of the petition date, only two of the obligations in the loan portfolio were in default and the average age of the loans in the loan portfolio exceeds 10 years.

In addition, the Debtors have two other significant assets.  The first consists of a legal malpractice action which is pending before the American Arbitration Association.  This proceeding was commenced in April of 2010 and is not close to trial.  The arbitration relates to alleged drafting errors in loan documentation which precipitated the Babcock and Brown litigation described earlier.  In addition, the Debtors have a claim for insurance proceeds resulting from a defaulted loan which has a value anywhere between $1,500,000 and $3,000,000 million dollars.  In addition the Debtors own miscellaneous office equipment, furnishings, etc. The Debtors' assets exceed their liabilities.

## D.      Secured Indebtedness of the Debtors

As set forth in the Debtors' Schedules of Assets and Liabilities and the Statement of Financial Affairs, as amended, and filed with the Clerk of the United States Bankruptcy Court, PFF is obligated to DZ Bank, as of the petition date in the approximate amount of $54,000,000.

## E.      Unsecured Indebtedness of the Debtors

The Debtors estimate that the aggregate unsecured claims in the Chapter 11 cases are $605,000.  As set forth in the Debtors' Schedules of Assets and Liabilities and the Statement of Financial Affairs, as amended, and filed with the Clerk of the United States Bankruptcy Court,

some creditors of PFC have asserted claims against PFF. It is unclear whether creditors of PFC have valid claims against PFF and thus they were listed in PFF's bankruptcy schedules. Notwithstanding, pursuant to the terms of the Plan, all creditors will be paid 100 cents on the dollar and any corporate distinction between PFF and PFC will be eliminated pursuant to the merger set forth in section 6.02 of the Plan.

## VI.  THE DEBTORS' BANKRUPTCY CASES

### A.    Events Since Commencement of Bankruptcy Case

Upon the filings of the Chapter 11 petitions, the Debtors filed papers seeking to (i) administratively consolidate the two cases, (ii) retain Zeisler and Zeisler, P.C. as counsel to the Debtors, and (iii) schedule preliminary and final hearings on use of cash collateral.

On or about June 30, 2010, the Bankruptcy Court granted the Debtors' motion for administrative consolidation and on July 1, 2010 entered an interim order authorizing use of cash collateral which gave the Debtors access to loan proceeds in order to operate and service the loan portfolio. The cash collateral Order was entered on consent of DZ Bank.

Subsequently, DZ Bank and the Debtors have negotiated three extensions of the cash collateral order, all on a preliminary basis and a final hearing has been scheduled for September 8, 2010.

In addition, the Debtors have filed a motion to retain special counsel, Day Piney, its pre-petition corporate counsel.

In addition, by Order dated July 14, 2010, the Debtors obtained an order of the Bankruptcy Court authorizing the retention of ordinary course professionals, ("OCP"). The OCP consists of law firms that provide advice and counsel to the Debtors with respect to problem with defaulted loans and their retention and compensation is subject to the terms and conditions in the ordinary course professional Order.

On July 19, 2010 the Debtors filed the schedules, statement of financial affairs for both PFC and PFF and said schedules were amended on July 19, 2010 and August 16, 2010.

To date, negotiations with DZ Bank have not resulted in agreement on the treatment of its secured claim.

## VII.  CONFIRMATION OF THE PLAN

**A.      Solicitation of Votes; Voting Procedures**

Ballots and Voting Deadline

A Ballot is enclosed with all copies of this Disclosure Statement mailed to all Holders of Claims and Interests entitled to vote.  BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

**The Bankruptcy Court has directed that in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than 5:00 p.m. Eastern Time on _____, 2010, at the following address:**

> James Berman, Esq.
> Craig I. Lifland, Esq.
> ZEISLER & ZEISLER, P.C.
> 558 Clinton Avenue
> Bridgeport, CT  06605
> Tel. 203-368-4234
> Fax 203-367-9678

**YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS AFTER 5:00 P.M. EASTERN TIME ON _____, 2010. FACSIMILE BALLOTS WILL BE ACCEPTED NO LATER THAN 5:00 P.M. EASTERN TIME ON_____, 2010.**

Parties in Interest Entitled to Vote

Any Holder of a Claim or Interest as of the date on which the Disclosure Statement Order was entered and whose Claim or Interest has not previously been disallowed by the Bankruptcy Court is entitled to vote to accept or reject the Plan, if such Claim or Interest is impaired under the Plan and either (a) such Holder's Claim has been scheduled by a Debtor (and such Claim is

25

not scheduled as disputed, contingent, or unliquidated), (b) the Holder of an Interest has been identified in a list of equity security holders filed by a Debtor with the Bankruptcy Court or is authorized by the Bankruptcy Court to vote on the Plan, or (c) such Holder has filed a proof of Claim or proof of Interest on or before the applicable Bar Date.[4]  Any Claim or Interest as to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder to whose Claim or Interest an objection has been made, temporarily allows such Claim or Interest in an amount that it deems proper for the purpose of voting to accept or reject the Plan.  Any such application must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Definition of Impairment

As set forth in section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan of reorganization unless, with respect to each claim or equity interest of such class, the plan:

(a)     leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest; or

(b)     notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

(i)     cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

(ii)    reinstates the maturity of such claim or interest as it existed before such default;

---

[4] If a Holder did not file a proof of Claim or Interest on or before the applicable Bar Date, but such Holder subsequently obtained an order from the Bankruptcy Court allowing the Holder to file a proof of Claim or Interest thereafter, such Holder will be entitled to vote to accept or reject the Plan.

(iii)      compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(iv)      does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Classes Impaired Under the Plan

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity or payment in full in Cash.

Claims and interests of the Debtors in Classes 1 and 4 are not impaired. Claims in Classes 2 and 3 are impaired and are entitled to vote on the Plan.

Administrative Expense Claims and Priority Tax Claims are unclassified. Their treatment is prescribed by the Bankruptcy Code, and the Holders of such Claims are not entitled to vote on the Plan.

Vote Required For Class Acceptance

Under the Bankruptcy Code, a Class of Claims that is entitled to vote to accept or reject the Plan shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan. The Bankruptcy Code also provides that a Class of Interests that is entitled to vote to accept or reject the Plan shall have accepted the Plan if it is accepted by the Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have voted on the Plan.

**B.**    **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to

27

hold a hearing on confirmation of a plan.  By order of the Bankruptcy Court, **the Confirmation Hearing on the Plan has been scheduled for _____, 2010 at __:__ __.m. Eastern Time** in the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division.  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  **Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court on or before 5:00 p.m. Eastern Time on _____, 2010**, at the following address:

Clerk of the United States Bankruptcy Court
District of Connecticut–Bridgeport Division
915 Lafayette Blvd.
Bridgeport, CT  06604

In addition, any such objection must be served upon the following parties, together with proof of service, so that they are *received* **by such parties on or before 5:00 p.m. Eastern Time on _____ 2010**:

| |
| --- |
| James Berman, Esq.<br>Craig I. Lifland, Esq.<br>ZEISLER & ZEISLER, P.C.<br>558 Clinton Avenue<br>Bridgeport, CT  06605<br>Tel. 203-368-4234<br>Fax 203-367-9678 |
| Steven E. Mackey<br>Office of the U.S. Trustee<br>The Giaimo Federal Building<br>150 Court Street, Room 302<br>New Haven, CT 06510 |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and the

28

Order Approving Disclosure Statement and Setting Deadline for Objections.  **UNLESS AN OBJECTION TO CONFIRMATION IS SERVED AND FILED ON THE DEBTORS, THROUGH THEIR COUNSEL, SO THAT IT IS ACTUALLY RECEIVED BY NO LATER THAN 5:00 P.M. EASTERN TIME ON _____ 2010, THE BANKRUPTCY COURT MAY NOT CONSIDER IT.**

The Debtors believe that the key dates leading up to and including the Confirmation Hearing are:

> _____, 2010, 5:00 p.m. Eastern Time:  Deadline for parties to file and serve any objection to the Plan.

> _____, 2010, 5:00 p.m. Eastern Time:  Deadline for parties entitled to vote on the Plan to have their ballots received by the tabulation agent.

> _____, 2010, __:__ __.m. Eastern Time:  Commencement of the Confirmation Hearing.

## C.    Requirements For Confirmation of a Plan

At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

> 1.    The plan complies with the applicable provisions of the Bankruptcy Code.

> 2.    The proponent of the plan complied with the applicable provisions of the Bankruptcy Code.

> 3.    The plan has been proposed in good faith and not by any means forbidden by law.

> 4.    Any payment made or promised by the debtors, by the plan Debtors, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

G:\JB\P\Petroleum & Franchise\Pleadings\Plan and Disclosure Statement\Second Amended Plan and D-S\SECOND AMENDED Disclosure Statement-Blacklined.docx

5.     (a)     (i)     The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii)     the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(b)     the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtors, and the nature of any compensation for such insider.

6.     Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7.     With respect to each impaired class of claims or interests:

(a)     each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code on such date; or

(b)     if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8.     With respect to each class of claims or interests:

(a)     such class has accepted the plan; or

30

(b)      such class is not impaired under the plan.

9.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a)      with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)      with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i)      if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)      if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(c)      with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim regular installment payments in cash –

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b); and

31

(d)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as described in subparagraph (c) above.

10.    If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

11.    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.    All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

13.    The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code that they have complied or will have complied with all the requirements of chapter 11.

## D.    Cramdown

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class.  A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims and interests.  As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.    With respect to a class of *secured claims*, the plan provides:

(a)    (i)    that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)    that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)    for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)    the realization by such holders of the "indubitable equivalent" of such claims.

2.    With respect to a class of *unsecured claims*, the plan provides:

(a)    that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

3.    With respect to a class of *equity interests*, the plan provides:

33

(a)      that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(b)      that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests.  The Debtors believe the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired Class of Claims or Interests and, thus, that the Plan may be confirmed under the applicable "cramdown" standards if necessary.

## VIII.  RISK FACTORS

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each Holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such holder's own advisors.

### A.      Insufficient Acceptances

For the Plan to be confirmed, each impaired Class of Claims and Interests is given the opportunity to vote to accept or reject the Plan.  With regard to such impaired voting Classes, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Claims of the Class voted.  The Plan will be deemed accepted by a Class of impaired Interests if the Plan is accepted by Interest Holders in such Class actually voting on the Plan who hold at least two-thirds (2/3) of the number of shares actually voting.  Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.  The Debtors reserve the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation

34

of the Plan regardless of the fact that a particular Class of Claims or Interests has not accepted the Plan.  However, there can be no assurance that any impaired Class of Claims or Interests under the Plan will accept the Plan or that the Debtors would be able to satisfy the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

**B.      Confirmation Risks**

The following specific risks exist with respect to confirmation of the Plan:

(i)      Any objection to confirmation of the Plan filed by a member of a Class of Claims or Interests can either prevent confirmation of the Plan or delay confirmation for a significant period of time.

(ii)      Since the Debtors may be seeking to obtain approval of the Plan over the rejection of one or more impaired Classes of Claims or Interests, the cramdown process could delay confirmation.

(iii)      Although the Debtors believe that the Plan will meet all applicable standards and tests for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion and confirm the Plan.

**C.      Conditions Precedent**

Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may never occur or be waived.  The Debtors, however, are working diligently with all parties in interest to ensure that all conditions precedent are satisfied.

**IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

One alternative to the Plan would be the conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code and the liquidation of the Assets under chapter 7.  The Debtors believe that the Plan is the best option for creditors and Interest Holders because it is intended to maximize recoveries by all Holders of Allowed Claims and Interests.

G:\JB\P\Petroleum & Franchise\Pleadings\Plan and Disclosure Statement\Second Amended Plan and D-S\SECOND AMENDED Disclosure Statement-Blacklined.docx

The Debtors have analyzed whether a chapter 7 liquidation of the Assets would be in the best interest of Holders of Claims and Interests and concluded that the liquidation value in a chapter 7 would be substantially lower than the value that may be realized under the Plan

The average age of the loans in the Debtors' loan portfolio currently has a remaining term of over 10 years.  The loans are collateralized by commercial real estate and guarantees.  The Debtors do not believe there is an established market of buyers for the existing loan portfolio. Thus, the sale of the portfolio would be at a discount.  The ability of unsecured creditors to be paid the allowed amount of their claims, with interest, as proposed in the Plan, could be jeopardized.   Clearly, the interest of the equity holders would be significantly diluted or eliminated.

The Debtors believe that a chapter 7 conversion and liquidation would result in substantial diminution in the value to be realized by Holders of Allowed Claims and Interests because:  (1) a chapter 7 trustee or trustees would be appointed, which would lead to significant additional administrative expenses for the fees and costs of the trustee(s), and the attorneys, accountants, asset managers and/or servicers, and other professionals that would assist such trustee(s) in a chapter 7 liquidation; (2) additional expenses and claims, some of which would be entitled to priority in payments, would arise in a chapter 7 liquidation; (3) a chapter 7 trustee would likely liquidate the Assets on a greatly accelerated "forced sale" pace (at the behest of DZ Bank or otherwise) that would erode the value of the Debtors' Assets and yield much lower sale proceeds and distributions to creditors and investors on the whole (with the possible exception of DZ Bank) than the proposed Plan; and (4) distributions to Holders of Claims and Interests could be delayed substantially due, in part, to the additional time necessary to convert the Bankruptcy Cases to cases under chapter 7 and for the chapter 7 trustee(s) and related professionals to become familiar with the complexities of managing and servicing the Debtors' Assets. Consequently, the Debtors believe that the Plan will provide a greater return to Holders of Allowed Claims and Interests than a rapid liquidation under chapter 7 controlled by a trustee who has no familiarity with the Debtors' portfolio of assets.

In any event, creditors are receiving at least what they would receive in liquidation because of the Plan proposes to pay creditors in full with interest.

## X.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a brief summary of certain federal income tax consequences that

36

Holders of Claims and Interests should consider.  This summary does not address all aspects of federal income taxation that may be relevant to all persons considering the Plan.  Special federal income tax considerations not discussed in this summary may be applicable to, among other persons, financial institutions, insurance companies, foreign corporations, tax-exempt institutions and persons who are not citizens or residents of the United States.  In addition, this summary does not discuss any foreign, state or local tax law, the effects of which may be significant.

This summary is based on the Internal Revenue Code of 1986, as amended ("IRC"), the regulations promulgated thereunder, judicial decisions, and administrative positions of the Internal Revenue Service (the "Service").  All Section references in this summary are to Sections of the IRC.  Any change in the foregoing authorities may be applied retroactively in a manner that could adversely affect persons considering the Plan.

No ruling will be sought from the Service with respect to the federal income tax aspects of the Plan and there can be no assurance that the conclusions set forth in this summary would be accepted by the Service.  No opinion has been sought or obtained with respect to the tax aspects of the Plan.

THIS SUMMARY IS INTENDED FOR GENERAL INFORMATION ONLY.  PERSONS CONSIDERING THE PLAN ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN AND THE LIQUIDATION OF THE DEBTORS AND OTHER TRANSACTIONS PROVIDED OR CONTEMPLATED UNDER THE PLAN, THE RECEIPT OF ANY PAYMENT UNDER THE PLAN, AND THE IMPACT ON THAT PERSON OR ANY OTHER PERSON OF ANY OBLIGATION IMPOSED UNDER THE PLAN.

## A.    Tax Consequences to the Debtors

Under the IRC, a taxpayer generally must include in gross income the amount of any discharge-of-indebtedness income realized during the taxable year.  If, as contemplated under the Plan, the Debtors pay all Allowed Claims, the Debtors will not recognize any discharge-of-indebtedness income pursuant to Section 108 of the IRC.  If, however, the Debtors do not pay all Allowed Claims in full, then the Debtors may be required to realize discharge-of-indebtedness income.

## B.    Tax Consequences To Creditors or Investors

37

A Holder of an Allowed Claim or an Allowed Interest who receives Cash or other consideration in satisfaction of any Allowed Claim or Allowed Interest may recognize ordinary income. Each Holder of a Claim or Interest is urged to consult with its tax advisor regarding the tax implications of any Distributions it may receive under the Plan.

**C.      Information Reporting and Withholding**

All distributions to Holders of Claims and Interests are subject to any applicable withholding (including employment tax withholding). Under the IRC, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" then in effect. Backup withholding generally applies if the Holder (a) fails to furnish a social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE FOREGOING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES THAT MAY BE APPLICABLE UNDER THE PLAN.**

G:\JB\P\Petroleum & Franchise\Pleadings\Plan and Disclosure Statement\Second Amended Plan and D-S\SECOND AMENDED Disclosure Statement-Blacklined.docx

## XI.  CONCLUSION

The Debtors urge Holders of Claims and Interests who are entitled to vote on the Plan to **ACCEPT** the Plan and to evidence such acceptance by returning their Ballots so that they will be received by **5:00 p.m. Eastern Time on _____, 2010.**

PETROLEUM & FRANCHISE CAPITAL, LLC

By:  **/s/Stanley A. Moskowitz**
Stanley A. Moskowitz, President and CEO
Its Authorized Representative

PETROLEUM & FRANCHISE FUNDING, LLC

By:  **/s/Stanley A. Moskowitz**
Stanley A. Moskowitz, President and CEO
Its Authorized Representative

39